■ In the Matter of SAUL C. LIPTON, Appellant, v BENJAMIN WARD, as Police Commissioner of the City of New York, Respondent.—Judgment, Supreme Court, New York County (Stanley S. Ostrau, J.), entered June 15, 1984, denying petitioner's application to vacate respondent's determination revoking his pistol license and dismissing his petition, affirmed, without costs or disbursements.

Petitioner, a dentist, held New York City and Nassau County licenses to carry a pistol. He also had a rifle license issued by the New York City Board of Firearms Control. On March 27, 1981, petitioner's New York City pistol license was suspended for six months due to a February 21, 1981 arrest for menacing with a pistol and misuse of a firearm. On January 6, 1983, his New York City pistol license was continued subject to a six-month term of probation. Petitioner's

subsequent application for renewal of the pistol license was rejected on or about January 24, 1983, because of his failure to notify the License Division of the New York City Police Department of the suspension of his Nassau County pistol license; his storage of guns in an unauthorized location (New Jersey); and his violation of probation. Petitioner was given notice of a hearing on his pistol license application at which the Nassau County suspension and petitioner's removal of firearms to New Jersey would be considered, as well as his "actions and attitudes."

At the hearing, at which petitioner was represented by counsel, his estranged wife, who was then involved in a contested matrimonial proceeding with him and who was represented by her own counsel, testified in support of the License Division's charge with respect to petitioner's actions and attitudes. She testified that she had known petitioner to act violently "on numerous occasions", that several times a year he would "kick me or push and shove, or bang me up against the wall", and that he "has verbally threatened the children and myself" and "has physically assaulted me on a number of occasions." Based upon these assaults she had been granted an order of protection.

Petitioner's wife also recounted specific incidents attesting to petitioner's violent nature. She described an incident in October 1981, when petitioner hit her head against the car door, causing her to suffer a concussion and other injuries for which she required emergency room treatment at North Shore University Hospital. She supported this testimony with photographs of her injuries. On another occasion, according to his wife, petitioner chased her around the bedroom and kicked her, causing her to fall against the wall and to suffer bruises of the arm and shoulder. In another incident which, according to petitioner's wife, occurred in September or October 1981, petitioner chased her around the house while holding one of his guns in his hand; in June of 1980 he "kicked and punched" her; and sometime around 1974 he threw her to the floor, causing injury to her neck and lower back and necessitating chiropractic and orthopedic treatment. Petitioner's wife also testified to several acts of violence committed by petitioner against his children. On one occasion, he kicked one of his daughters; another time he hit one of them with his fists.

Petitioner's wife also described various incidents involving petitioner's use of guns. He would "practice aiming" with his guns while watching television. He built a firing range in the basement of their home and encouraged his children to use it

to practice their shooting. He kept guns in various places around the house, including a locked basement safe, a large unlocked "carrying case", a locked attaché case, under his bed while he slept and, earlier in their marriage, in the top dresser drawer. Once, not realizing the gun was loaded, petitioner's wife shot a hole in the dresser. Another time, petitioner shot himself in the foot when he purportedly dropped a loading mechanism and a bullet discharged. Petitioner also shot holes in the pipes.

Testifying on his own behalf, petitioner admitted that he would "dry-fire in the house frequently while * * * watching television", and that he once shot himself in the foot in an "accident." He also acknowledged that he maintained a firing range in the basement of his home, for which, he insisted, no authorization was required. He admitted that his wife shot a hole in the dresser but attempted to justify the incident by claiming that she was "unstable." Petitioner denied, however, that he ever threatened anyone with a gun or physical violence, although he did concede that "[t]he reason [his wife] is physically unable to work is because I got physical with her during the course of a few marital fights." After one of their arguments, in which he stuck his foot out to "fend her off", his wife "fell against the wall and got bruises." It was after this incident that petitioner consented to the issuance of a temporary order of protection. A permanent order was subsequently issued.

On such a record we find ample evidence to support the License Division's revocation of petitioner's pistol license because of his actions and attitudes. The evidence discloses that on several occasions he failed to safeguard properly his firearms in his home and that such failure created a grave risk to the safety of others. Indeed, on this ground alone, revocation would have been proper. (See, Brescia v McGuire, 509 F Supp 243, 247.) Furthermore, petitioner's manner of handling his guns casts serious doubt as to his character and fitness to possess a concealed weapon. For example, he often practiced aiming and "dry-firing" in his house while watching television. Such a practice is dangerous and irresponsible since any ammunition inadvertently left in the chamber and accidentally discharged could cause injuries to others and damage property. In fact, in one incident in the house, petitioner shot himself in the foot. He also shot holes in the pipes. Petitioner's wife also testified that he once boasted, "I can't wait for someone to come in the house so I can blow them away." Exercising "poor judgment in the handling of a weapon" is a

ground for revoking a pistol license. *(See, Matter of Silverberg v Dillon,* 73 AD2d 838.)* Finally, petitioner's action toward his wife reveals his propensity for violence and unfitness to possess a pistol license. "The State has a substantial and legitimate interest and indeed, a grave responsibility, in insuring the safety of the general public from individuals who, by their conduct, have shown themselves to be lacking the essential temperament or character which should be present in one entrusted with a dangerous instrument." *(Matter of Pelose v County Ct.,* 53 AD2d 645, *appeal dismissed* 41 NY2d 1008.)

The argument that the key evidence of petitioner's actions and attitudes was provided by his wife is meritless. Petitioner substantiated many of her assertions, including that he sometimes kept his guns unsecured, often dry-fired in the living room and had physical altercations with her. Thus, even if the testimony had been entirely discredited and petitioner's version of the facts accepted, ample evidence exists to justify the revocation. *(See, Matter of Harris v Codd,* 57 AD2d 778, 779, *affd* 44 NY2d 978.)* In any event, the hearing officer, who was the sole judge of credibility, could properly accept one witness' testimony over that of another. *(See, Matter of St.-Oharra v Colucci,* 67 AD2d 1104.)* Thus, the License Division's determination that petitioner's actions and attitudes warranted revocation of his pistol permit was neither arbitrary nor capricious.

Since no evidence was introduced showing that petitioner's basement firing range was within 500 feet of any of the enumerated structures listed in section 11-0931 (4) of the Environmental Conservation Law there is no rational basis upon which to revoke petitioner's license for maintaining such a range. Nor did the License Division establish the charge based upon the storage of firearms in New Jersey. Penal Law § 400.00 (6), upon which the License Division relies, provides that a license to carry firearms is valid throughout the State. It does not, however, provide a limitation on carrying a firearm outside the State. The License Division fails to cite any statute or regulation prohibiting such conduct.

We have examined petitioner's other contentions and find that they are without merit. Concur—Sullivan, Ross, Fein and Milonas, JJ.

Kupferman, J. P., dissents in a memorandum as follows: I would reverse. The decision to revoke petitioner's pistol license should be annulled and the matter remanded.

Petitioner and his wife have been involved in divorce pro-

ceedings since July 1981. The testimony at the revocation hearing is replete with evidence that the key witness, Mrs. Lipton, sought to satisfy a personal vendetta against her husband, the petitioner. Without her testimony, there is insufficient evidence in the record to justify revocation of the petitioner's pistol license.

Courts have upheld pistol license revocations in cases, for example, where the licensee has admitted to negligent discharging of his pistol (see, Matter of Sobus v Contiguglia, 113 AD2d 1027); and where the licensee has fired the pistol improperly in an apartment, displayed it improperly to police officers, and has been deemed medically unfit to possess firearms (see, Matter of Harris v Codd, 57 AD2d 778, affd 44 NY2d 978). These revocations have been upheld where, unlike the instant case, the determination was "supported by substantial evidence in the record and was neither arbitrary nor capricious." (Matter of Jenkins v Martin, 99 AD2d 811.)

The record here does not reveal evidence to substantiate revocation. The clearly biased testimony of the petitioner's estranged wife supports nothing more than an arbitrary and capricious determination of revocation.

The majority's finding, with which I concur, that there is nothing in the record to indicate that there has been a violation by petitioner-appellant of Environmental Conservation Law § 11-0931 (4), has removed that aspect from the case. If we cauterize, as fairness dictates, the wife's testimony, there is no evidence to warrant revocation.